UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDWARD DAVIS,

                          Plaintiff,

          v.

THE POWER OF AUTHORITY OF THE
STATE OF NEW YORK *et al*.,

                          Defendants.

No. 19-CV-792 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Edward Davis
New Windsor, NY
*Pro Se Plaintiff*

Greg Anthony Riolo, Esq.
Brian Bodansky, Esq.
Jackson Lewis LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Edward F. Davis ("Plaintiff") brings this Action against Paul Belnick

("Belnick"), Justine Driscoll ("Driscoll"), Nancy Harvey ("Harvey"), Kristine Pizzo ("Pizzo"),

Rani Pollack ("Pollack"), Gil Quiniones ("Quiniones"), Sangeeta Ranade ("Ranade"), Guy

Sliker ("Sliker," and collectively, the "Individual Defendants") and his former employer, the

Power of Authority of the State of New York ("NYPA," and collectively, "Defendants").  (Dkt.

No. 33.)[1]  Plaintiff alleges that Defendants discriminated and retaliated against him on the basis

_____

        [1] At the time of Plaintiff's termination from the NYPA in April 2018, (*see* Second
Amended Complaint ("SAC") (Dkt. No. 33)), Defendant Quiniones held the title of President

of his disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*

("Rehabilitation Act"), the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*

("ADA"), and the New York State Human Rights Law, N.Y. Exec. §§ 290 *et seq.*,

("NYSHRL"), as well as retaliation in violation of the Family and Medical Leave Act, 29 U.S.C.

§§ 2601 *et seq.* ("FMLA").  (*Id.*)  Before the Court is Defendants' Motion for Summary

Judgment.  (Dkt. No. 88.)  For the reasons explained below, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Second Amended Complaint ("SAC"), (Dkt. No.

33), Plaintiff's statement pursuant to Local Civil Rule 56.1, (Pl.'s Rule 56.1 Statement in Opp'n

to Mot. ("Pl.'s 56.1") (Dkt. No. 101)), Defendants' statement pursuant to Local Civil Rule 56.1,

(Defs.' Rule 56.1 Statement in Supp. of Mot. ("Defs.' 56.1") (Dkt. No. 90)), and other

documents submitted by the Parties, and are recounted "in the light most favorable to" Plaintiff,

the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also*

*Johnson v. Kitt*, No. 15-CV-7823, 2021 WL 1105438, at *1 (S.D.N.Y. Mar. 23, 2021).

NYPA is a corporate municipal instrumentality and political subdivision of the State of

New York and serves as a public power utility in the State of New York. (Pollack Decl. ¶ 3 (Dkt.

No. 93.)  Plaintiff was hired by NYPA in September of 2009 as a "Senior Electrical Engineer I"

---

and Chief Executive Officer of NYPA, (*id.* ¶ 10), Defendant Harvey held the title of Head
Affirmative Action Officer, (*id.* ¶ 11), Defendant Driscoll held the title of Executive Vice
President and General Counsel, (*id.* ¶ 12), Defendant Belnick held the position of Executive Vice
President of Energy Services, (*id.* ¶ 13), Ranade held the title of Vice President of Clean Energy
Business and Market Development, (*id.* ¶ 14), Defendant Pizzo held the title of Senior Vice
President of Human Resources, (*id.* ¶ 15), Defendant Pollack held the title of Director of Human
Resources and Employee Relations, (*id.* ¶ 16), and Defendant Sliker held the title of Director of
Energy Services and Product Development, (*id.* ¶ 17).

in the Design Engineering group of the Energy Services Department.  (SAC ¶ 5; Defs.' 56.1 ¶ 4.)[2]  Plaintiff brought "25 years of experience in the power and energy industry involving primarily design and engineering and analysis of electric power systems."  (SAC ¶ 3.)  This experience also included a Bachelor of Science in Electrical Engineering and Computer Engineering from Rutgers University and a certification for nuclear engineering and a professional license for power systems analysis and design.  (Davis Decl. Ex. A (Dkt. No. 103-1); Davis Decl. Ex. B (Dkt. No. 103-2).)

Plaintiff suffers from Chron's disease.  (SAC ¶ 2.)  "Over the course of Plaintiff's employment with the NYPA, Plaintiff took FMLA leave on a number of different occasions, beginning in 2011 and the latest in 2017."  (Defs.' 56.1 ¶ 68; *see also* Riolo Decl. Ex. M ("Pl.'s 2011 FMLA Paperwork") (Dkt. No. 92-13); Riolo Decl. Ex. N ("Pl.'s 2012 FMLA Paperwork") (Dkt. No. 92-14); Riolo Decl. Ex. O ("Pl.'s 2013 FMLA Paperwork") (Dkt. No. 92-15); Riolo Decl. Ex. P ("Pl.'s 2014 FMLA Paperwork") (Dkt. No. 92-16); Riolo Decl. Ex. Q ("Pl.'s 2015 FMLA Paperwork") (Dkt. No. 92-17); Riolo Decl. Ex. R ("Pl.'s 2016 FMLA Paperwork") (Dkt. No. 92-18); Riolo Decl. Ex. S ("Pl.'s 2017 FMLA Paperwork") (Dkt. No. 92-19).  "Over the course of seven . . . years, Plaintiff was never denied FMLA leave."  (Riolo Decl. Ex. B ("Davis Deposition Tr.") 159:13–14 (Dkt. No. 92-2).)[3]

---

[2] In the SAC, Plaintiff alleges that he began employment with the NYPA on September 26, 2009.  (SAC ¶ 5.)  In their Rule 56.1 Statement, Defendants state that Plaintiff began employment with the NYPA on September 28, 2009.  Plaintiff attached his offer letter from the NYPA as an exhibit to his Opposition, which is dated September 11, 2009.  (Davis Decl. Ex. B (Dkt. No. 103-4).)  For the purpose of resolving the instant Motion, the Court will assume that Plaintiff began employment with the NYPA sometime in September of 2009.

[3] In 2011, "Plaintiff was approved for FMLA leave to care for injuries he sustained in a car accident."  (Defs.' 56.1 ¶ 69; Pl.'s 2011 FMLA Paperwork.)  Every year thereafter from 2012 to 2017, Plaintiff requested—and was granted—FMLA leave for his Chron's disease and related medical issues.  (Pl.'s 2012 FMLA Paperwork; Pl.'s 2013 FMLA Paperwork; Pl.'s 2014 FMLA

Plaintiff alleges that he "endured numerous years of harassment, discrimination[,] and abuse" during his time at the NYPA, (SAC ¶ 20), "on the grounds of his chronic illness and disability, Chron's disease," (SAC ¶ 23).  To this end, Plaintiff filed two complaints with the NYPA's Affirmative Action Office ("AAO")—one in 2014, one in 2016—in which he claimed that Sliker was discriminating against him based on his disability.  (Davis Decl. Ex. K ("Pl.'s 2014 AAO Complaint") (Dkt. No. 109-7); Davis Decl. Ex. V ("Pl.'s 2016 AAO Complaint") (Dkt. No. 114-1).)  Plaintiff alleges that the discrimination began when he was transferred into Sliker's group in 2012.  (SAC ¶ 5.)  Specifically, Plaintiff alleges:

> Sliker promptly began targeting Plaintiff as a result of the FMLA leave he took, Plaintiff's disability, and Plaintiff's complaints about Sliker's discriminatory treatment of him. Plaintiff began receiving unwarranted negative performance reviews, being unfairly denied annual incentive pay because of negative performance reviews, being denied needed training, and being isolated/excluded from team meetings and other opportunities to collaborate with colleagues.

(*Id.*)

According to Defendants, beginning in 2012, Plaintiff developed "a history of poor performance and issues with his professionalism during his employment with NYPA," (Defs.' 56.1 ¶ 5), resulting in the issuance of various warning letters, (*see* Riolo Decl. Ex. C ("2012 Warning Letter") (Dkt. No. 92-3); Riolo Decl. Ex. G ("2014 Warning Letter") (Dkt. No. 92-7); Riolo Decl. Ex. H ("2016 Final Warning Letter") (Dkt. No. 92-8), and multiple negative performance reviews from 2013 through 2016, (*see* Riolo Decl. Ex. D ("Pl.'s 2013 Performance Review") (Dkt. No. 92-4); Davis Decl. Ex. D ("Pl.'s 2014 Performance Review") (Dkt. No. 103-11); Riolo Decl. Ex. E ("Pl.'s 2015 Performance Review") (Dkt. No. 92-5); Riolo Decl. Ex. F

Paperwork; Pl.'s 2015 FMLA Paperwork; Pl.'s 2016 FMLA Paperwork; Pl.'s 2017 FMLA Paperwork.)

("Pl.'s 2016 Performance Review") (Dkt. No. 92-6).)  The Court will describe each of these events in chronological order.

On March 8, 2012, "Plaintiff was issued a warning letter for his inappropriate discussions with Metro-North, a client of NYPA."  (Defs.' 56.1 ¶ 6; *see also* 2012 Warning Letter.)  Specifically, Plaintiff "represented to Metro-North that a particular piece of equipment would be replaced, with the cost being borne by NYPA—a representation that Plaintiff had no authority to make."  (Defs' 56.1 ¶ 7.)  As the letter notes, "[Plaintiff's] management team has had several discussions with [Plaintiff] in the past regarding [his] responsibility to be forthright in expressing [his] opinions internally and then to proceed with the consensus management decisions once made."  (2012 Warning Letter at 2.)  Further, the letter states that Plaintiff was "defensive and reluctant to accept responsibility that [his] actions affected the working relationship between Metro-North and NYPA," and that he "went on to disparage [his] immediate supervisor and [his] senior manager by stating that [he] knew more about the topic than the two of [them] combined."  (*Id.*)  Defendants considered the situation to be "so severe as to warrant issuing Plaintiff an 'off-cycle' performance review (that is, a performance review issued at a time other than regularly scheduled), and that such review would rate Plaintiff as not meeting expectations."  (Defs.' 56.1 ¶ 9.)  "Further, Plaintiff lost five vacation days and was removed from the Metro-North account effective immediately."  (*Id.*; 2012 Warning Letter at 2.)  Plaintiff "disputes the characterization of the incident . . . ."  (Pl.'s 56.1. ¶ 7.)  In rebuttal, Plaintiff claimed that he "acted appropriately in this situation."  (Davis Ex. F ("Pl.'s 2012 Rebuttal") 2 (Dkt. No. 104-2).)

In 2013, Plaintiff received an overall performance review of "Partially Achieves Expectations." (Defs.' 56.1 ¶ 12; Pl.'s 2013 Performance Review.)[4]  Specifically, the narrative portion of the review notes that "communications" with the Plaintiff were "challenging in 2013." (Pl.'s 2013 Performance Review at 12.)  Further, "[c]coordinating multiple project deliveries between [Plaintiff], [his supervisor,] and customers [did] not always go[] smoothly." (*Id.*)  Plaintiff was also "reluctan[t] to share draft work." (*Id.*)  However, the review also noted that despite these issues, "the overall quality of [Plaintiff's] work is good . . . ." (*Id.*)

On December 16, 2014, Plaintiff received a written warning from John Markowitz[5] and Sliker regarding Plaintiff's "failure to communicate his absences from work" in violation of NYPA's policies. (Defs.' 56.1 ¶ 17).  According to NYPA's Employee Policy 3.9, "Employees who are absent from work due to their own illness or injury (or that of eligible family members . . .), must notify their supervisor of such absence as soon as practicable, and keep the supervisor informed as to their expected date of return." (2014 Warning Letter at 1.)  Similarly, NYPA's Policy 3.3 states, "Absent unusual circumstances, an employee will be expected to comply with his/her site/department's normal procedures for requesting leave and calling in absences.  Failure to following such procedures may result in a delay or denial of FMLA protection." (*Id.*)  The letter details five instances from April to December 2014 in which Plaintiff was absent from work and failed to inform his supervisor. (*See id.*)  The letter states, "Despite the fact that [Plaintiff's supervisor] ha[s] spoken to [him] on several occasions about [his] obligations

---

[4]  According to the rubric attached to Plaintiff's 2013 Performance Evaluation, "Partially Achieves Expectations" means: "Performance met some job expectations but did not meet the remainder.  Performing at a minimal level expected for the role. Improvement is needed to fully meet the expectations." (Pl.'s 2013 Performance Review at 12.)

[5]  It is not clear from the record what John Markowitz's position was at the NYPA at the time that this letter was written.

pursuant to [NYPA's] Policy, [he] continue[s] to fail to report when [he is] unable to come to work, and to date, ha[s] not provided a satisfactory reason to explain this continued refusal." (*Id.*).  Further, when Plaintiff met with his supervisor regarding these absences, Plaintiff "responded that [he was] 'not interested' in providing [his supervisor with] notice [of] when [he] would be out of the office." [6]  (*Id.* at 2.)  In response, Plaintiff states that he was "consistent in communicating his absence due to his Crohn's disease as required by supervisor and company policy."  (Pl.'s 56.1 ¶ 18.)

At the end of 2014, Plaintiff again received an overall performance review of "Partially Achieved Expectations."  (Pl.'s 2014 Performance Review.)  The narrative portion of the review stated, "This year, there was a lack of communication from [Plaintiff] regarding project timeliness and results."  (*Id.*)  It further notes that Plaintiff "was routinely unresponsive to requests to notify [his supervisor] of his work schedule and absences."  (*Id.*)

In 2015, Plaintiff also received an overall performance review of "Partially Achieved Expectations."  (Pl.'s 2015 Performance Review.)  In the narrative portion of the review, Sliker noted:

> While [Plaintiff] improved his overall communication with management regarding out of office time, his communication on project assignments is still poor.  Almost all assignment deadlines have not been met and new milestone schedules are hard to develop.  In some cases, the issue appears to be that [Plaintiff] adds scope to the assignment beyond what was asked.

(*Id.* at 3.)  Sliker also wrote, "[Plaintiff] has told me over this past year that he does not respect me as a manager and is only staying in our group so that he can continue to provide guidance and oversight.  In short, [Plaintiff] is not receptive to supervision."  (*Id.*)

---

[6] The letter is written from the first-person perspective, but it is not clear whether John Markowitz or Sliker took the pen.  (*See id.*)

On September 29, 2016, Plaintiff received a final warning from Sliker based on Plaintiff's "continued lack of timely and complete communication to management and Corporate Human Resources surrounding [his] time out of office and medical leave" and "ongoing performance deficiencies."  (2016 Final Warning Letter at 1; Defs.' 56.1 ¶ 25.)  The letter states:

> During [Plaintiff's] medical leave beginning May 21, 2016 through June 21, 2016, [he] routinely failed to communicate with [his supervisor] and Corporate Human Resources in a timely manner to advise of [his] anticipated return to work.  Further, during [his] leave from July 14 through September 19 [Plaintiff] failed to respond timely and completely to Corporate Human Resources requests.

(2016 Final Warning Letter at 1.)  The letter went on to say that Plaintiff's "lack of communication and responsiveness surrounding absences is excessive and will not be tolerated . . . . Failure to demonstrate immediate and consistent improvement may lead to further disciplinary action up to and including termination."  (*Id.* at 2–3.)  Plaintiff states that he "regularly communicated with [his] employer [regrading] his whereabouts."  (Pl.'s 56.1 ¶ 26.)  Further, according to Plaintiff, the final warning letter "refer[ed] to [P]laintiff's need for medical leave for major abdominal surgery to remove scar tissue brought on from countless Crohn's attacks due to having to work in a hostile work environment, isolated, where plaintiff was not welcomed and no matter what plaintiff did his work was not appreciated."  (Pl.'s 56.1 ¶ 25.)

At the end of 2016, Plaintiff received an overall performance review of "Below Expectations."  (Pl.'s 2016 Performance Review at 5.)  The narrative portion of the performance review stated that Plaintiff "did not exhibit competency in 2016 in terms of communication, collaborations, and execution."  (*Id.* at 4.)  It went on to note, "Significant progress needs to be made to show that [Plaintiff is] effective at building teams and managing collaborative projects without significant manager oversight."  (*Id.*)

On March 26, 2018, NYPA placed Plaintiff on administrative leave in order to investigate whether Plaintiff misused the corporate credit card for personal reasons. (Defs.' 56.1 ¶¶ 59–61.)[7] The NYPA ultimately found him to be in violation of company policy, finding charges that included "purchases from health store GNC, fees to take the Law School Admission Test ("LSAT")[,] and purchases from FedEx." (*Id.* at ¶ 61.) Plaintiff also made "numerous gas purchases, parking charges and other charges for Metro-North and other transit entities," which were "inappropriate in light of Plaintiff's concurrent use of NYPA's TransitChek program." (*Id.* at ¶¶ 62–63.)

In an April 11, 2018, internal memorandum from Sliker to Ranade entitled "Termination Justification: Edward Davis," Sliker wrote that Plaintiff's misuse of the company credit card, "in tandem with his poor performance history, has brought me to recommend termination of his employment . . . ." (Riolo Decl. Ex. AA ("Termination Justification Letter") 2 (Dkt. No. 92-27).) NYPA terminated Plaintiff's employment on April 23, 2018. (*See* Riolo Decl. Ex. L ("Pl.'s Termination Letter") (Dkt. No. 92-12).) According to the termination letter:

> Management has completed its investigation and determined that you used your NYPA Citibank Travel Credit Card for personal purchases in violation of the terms of use when you were issued that credit card. As a result, your employment with the [NYPA] as a Senior Energy Services Product Development Engineer shall be terminated effective April 24, 2018.

(*Id.*) Defendants note that "NYPA also terminated at least three employees other than Plaintiff for making unauthorized, personal purchases with their corporate credit cards—one employee

---

[7] Defendants note that in 2015, NYPA "conducted an internal audit to ensure that employees were using their corporate credit cards in accordance with NYPA policy." (*Id.* ¶ 55.) That audit revealed that a number of employees were using their corporate credit card for personal items and then later reimbursing NYPA for those expenses. (*Id.* ¶ 56.) NYPA subsequently issued a clarified corporate credit card policy, which Plaintiff received and signed on June 30, 2015. (*Id.* ¶¶ 57–58.)

was terminated on January 23, 2015, the next on August 10, 2018, and another on January 14, 2020." (Defs.' 56.1 ¶ 75; *see also* Riolo Decl. Ex. U ("Comparator Termination Justification") (Dkt. No. 92-21).)

After Plaintiff was terminated, his application "for unemployment benefits was denied on the basis that [P]laintiff was . . . fired for misconduct and was therefore not eligible to receive benefits." (SAC ¶ 22.) In July 2018, Plaintiff filed an appeal with the New York State Department of Labor ("DOL"). (*Id.*) During a subsequent hearing, the Administrative Law Judge found that Plaintiff's misuse of NYPA's corporate credit card did not rise to the level of misconduct, thus overruling the initial determination disqualifying Plaintiff from receiving unemployment benefits. (*See* Davis Decl. Ex. P (ALJ Findings and Opinion) (Dkt. Nos. 111-1, 111-2) 9 ("I thus find it has not been substantiated that the claimant was discharged under conditions rising to the level of disqualifying misconduct within the meaning of the Law.").)

Plaintiff filed a Charge against NYPA with the New York District Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on July 18, 2018 for disability discrimination and retaliation. (Davis Decl. Ex. T (Dkt. Nos. 113-1, 113-2.)[8] The EEOC declined to pursue Plaintiff's Charge, and Plaintiff's right to sue letter from the EEOC is dated October 29, 2018. (*Id.*)

B. Procedural History

Plaintiff filed his initial Complaint on January 25, 2019. (Dkt. No. 2.) On February 6, 2019, the Court granted Plaintiff's application to proceed in forma pauperis. (Dkt. No. 6.) On May 24, 2019, Defendants filed an Answer to the initial Complaint. (Dkt. No. 21.) On June 17,

---

[8] Although the date next to Plaintiff's signature on his EEOC Charge is June 29, 2018, the Charge is stamped as having been received by the EEOC on July 18, 2018. (*Id.*)

2019, Plaintiff submitted his First Amended Complaint.  (Dkt. No. 24.)  On July 2, 2019, Defendants filed an Answer to the First Amended Complaint.  (Dkt. No. 32.)  On July 23, 2019, without seeking leave of the Court, Plaintiff submitted his Second Amended Complaint.  (Dkt. No. 33.)  On August 6, 2019, Defendants filed an Answer to the Second Amended Complaint. (Dkt. No. 38.)  The Court held an initial conference on December 17, 2019, (Dkt. (minute entry for Dec. 17, 2019)), and adopted a case management and scheduling order, (Dkt. No. 40).

On December 30, 2020, Defendants filed a pre-motion letter seeking leave to file and outlining the grounds for the instant Motion.  (Dkt. No. 75.)  Plaintiff responded on January 13, 2021.  (Dkt. No. 76.)  The Court held a pre-motion conference on February 19, 2021.  (Dkt. (minute entry for Feb. 19, 2021).)  On March 15, 2021, the Court adopted a briefing schedule. (Dkt. No. 84.)  On May 7, 2021, Defendants filed their Motion for Summary Judgment and accompanying papers.  (Dkt. Nos. 88–93.)  On July 27, 2021, Plaintiff filed his Opposition and accompanying papers.  (Dkt. Nos. 100–115.)  Defendants filed their Reply and accompanying papers on August 16, 2021.  (Dkt. Nos. 120–121.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper*

*Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").  Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."  *Aspilaire v.*

*Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and internal quotation

marks omitted); *see also Schiano v. Quality Payroll Sys., Inc*., 445 F.3d 597, 608 (2d Cir. 2006)

("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of

discrimination claims in cases lacking genuine issues of material fact, and may be appropriate

even in the fact-intensive context of discrimination cases."  (citations and internal quotation

marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At this stage,

"[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any

factual issues to be tried."  *Brod*, 653 F.3d at 164 (internal quotation marks omitted).  Thus, a

court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm.*

*Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks

omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only

evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am.,*

*Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish

facts, the statements 'must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant . . . is competent to testify on the matters

stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4));

*see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires

a motion for summary judgment to be supported with affidavits based on personal knowledge

. . . .");  *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not

based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).  Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp*., 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and citation omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment."  *Vt. Teddy Bear Co*., 373 F.3d at 244; *see also Jackson v. Fed. Exp*., 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence[] are insufficient to overcome a motion for summary judgment."  *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, citation, and internal quotation marks omitted); *see also Falls v. Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *10 (S.D.N.Y. Mar. 26, 2021) (same); *Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (a pro se litigant's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quotation marks and citation omitted)).

B.  Analysis

    1.  ADA, Rehabilitation Act, and NYSHRL Discrimination Claims

        Plaintiff brings disability discrimination claims under the ADA, the Rehabilitation Act, and the NYSHRL.  (*See* SAC ¶ 4).  The ADA "prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability."  *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (quotation marks omitted).  Specifically, the ADA provides that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees."  42 U.S.C. § 12112(a).

        Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  *Henrietta2 D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (quoting 29 U.S.C. § 794(a)).

        Finally, "the NYSHRL states that it is 'an unlawful discriminatory practice' for an employer, based on an individual's [disability], 'to discharge from employment . . . or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.'"  *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 323 (S.D.N.Y. 2020) (quoting N.Y. Exec. Law § 296(1)(a)).  "Moreover, § 296 of the NYSHRL provides that it 'shall be an unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to the known disabilities . . . of an employee[.]"  *Id.* (quoting N.Y. Exec. Law § 296(3)(a)).

16

To evaluate a claim for discrimination under the ADA, the Rehabilitation Act, or the NYSHRL, the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *See Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 796 (S.D.N.Y. 2020) (evaluating ADA, Rehabilitation Act, and NYSHRL claims together under the *McDonnell Douglas* framework); *see also Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 18 (2d Cir. 2013) (summary order) (applying the *McDonnell Douglas* framework to discrimination claims under the ADA and NYSHRL); *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown ("RECAP")*, 294 F.3d 35, 48–49 (2d Cir. 2002) (same for the ADA and Rehabilitation Act); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000) (same for the NYSHRL); *Heyman*, 198 F.3d at 72; *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 541 (N.D.N.Y. 2021).  "Under *McDonnell Douglas*, [the] plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination."  *Heyman*, 198 F.3d at 72 (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).  "The burden of production then shifts to [the] defendant[ ], who must offer through the introduction of admissible evidence a non-discriminatory reason for [its] actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action."  *Id.*  If the defendant meets this burden, the plaintiff "then must show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more."  *Id.*  (internal quotation marks omitted).

a. Prima Facie Case

"To establish a prima facie case of discrimination under the ADA, [a] plaintiff must show by a preponderance of the evidence that (1) his [or her] employer is subject to the ADA; (2) he [or she] was disabled within the meaning of the ADA; (3) he [or she] was otherwise qualified to perform the essential functions of his [or her] job, with or without reasonable accommodation; and (4) he [or she] suffered adverse employment action because of his [or her] disability." *Id.*; *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000). Courts in this district have found that "[t]he elements that apply to an ADA claim apply to claims under the NYSHRL . . . as well." *Pagan v. Morrisania Neighborhood Family Health Ctr.*, No. 12–CV–9047, 2014 WL 464787, at *6 (S.D.N.Y. Jan. 22, 2014); *accord Thomson v. Odyssey House*, No. 14-CV-3857, 2015 WL 5561209, at *18 (E.D.N.Y. Sept. 21, 2015) ("The elements to find disability discrimination under the NYSHRL . . . generally track the ADA") (citing *Kinneary v. City of New York*, 601 F.3d 151, 158 (2d Cir. 2010)), *aff'd*, 652 F. App'x 44 (2d Cir. 2016) (summary order). The Second Circuit also has instructed courts to analyze Rehabilitation Act claims "in tandem" with ADA claims. *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem."); *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995) (applying the same elements to ADA and Rehabilitation Act claims).

Establishing a prima facie case "is not a demanding burden[,]" and, "[o]nce [the burden is] met, [the plaintiff] creates a presumption that the employer discriminated against the [plaintiff] in an unlawful manner." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998); *see also Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09-CV-2583, 2012 WL 1079943, at *14 (S.D.N.Y. Mar. 30, 2012) (adopting same standard). The Second Circuit has

18

held that the "failure to make reasonable accommodation, when the employee has satisfied the first three elements of his claim, amounts to discharge 'because of' his [or her] disability." *Parker*, 204 F.3d at 332.

Plaintiff alleges that NYPA discriminated against him by wrongfully terminating his employment because of his disability. (*See* Pl.'s Opp'n at 16–21.) Defendants do not dispute that Plaintiff meets the first and second elements needed to establish a prima facie case of discrimination under the ADA or the NYHRSL. (Defs.' Mem at 10.) That is, Defendants do not dispute that the NYPA is subject to the ADA,[9] and that Plaintiff is disabled on account of his disability. (*Id.*) With respect to the fourth factor, Defendants do not dispute that Plaintiff's termination constitutes an adverse employment action, but they argue that Plaintiff cannot "show the decision to terminate Plaintiff's employment was due to his disability." (*Id.*)

Defendants argue that Plaintiff does not meet the third element because "Plaintiff cannot show that he was adequately performing his responsibilities," citing to the fact that "Plaintiff's performance and communication skills became sufficiently problematic to warrant the issuance of multiple written warnings, negative performance reviews and discipline." (*Id.* at 11.) Conversely, Plaintiff alleges that he *was* qualified for the position he held at the NYPA. (SAC ¶ 3; Pl.'s Rule 56.1 ¶ 13; Pl.'s Opp'n at 7–9, 17 18.) Plaintiff cites his Bachelor of Science in Electrical Engineering and Computer Engineering from Rutgers University, his "25 years of experience in the power and energy industry," (SAC ¶ 3), and his "certification for nuclear engineering and a professional license for power systems analysis and design," as qualifications for his position as a Senior Electrical Engineer, "which required him to supervise preparation of

---

[9] The Court will assume that, in the absence of any argument to the contrary, Defendants also do not dispute that the NYPA is subject to the NYSHRL and the Rehabilitation Act.

design documents by employer's sub[-]contra[c]tors on energy services project[s]," (Pl.'s Opp'n at 8; *see also* Davis Decl. Ex. A (Dkt. No. 103-1); Davis Decl. Ex. B (Dkt. No. 103-2)).  The Court agrees with Plaintiff.

"The qualification element of a disability-discrimination claim requires only a 'minimal showing' that the plaintiff 'possesses the basic skills necessary for performance of [the] job.'"  *Limauro v. Consol. Edison Co. of New York, Inc*., No. 20-CV-03558, 2021 WL 466952, at *6 (S.D.N.Y. Feb. 9, 2021) (alteration in original) (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)).  Although "performance can be relevant to [a plaintiff's] qualifications, the bar is low."  *Singh v. Knuckles, Komosinski & Manfro, LLP*, No. 18-CV-3213, 2020 WL 6712383, at *10 (S.D.N.Y. Nov. 16, 2020).  Indeed, "[t]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a legitimate non-discriminatory basis for its decision."  *Boatright v. U.S. Bancorp*, No. 18-CV-7293, 2020 WL 7388661, at *14 (S.D.N.Y. Dec. 16, 2020) (alteration in original) (italics omitted) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)).  "The inquiry must wait until the burden has shifted to the defendant."  *Id.* (quoting *Owens*, 934 F.2d at 409).  The court in *Boatright* found that Plaintiff met the qualification prong where the plaintiff "had years of experience," even though she "did suffer from performance deficiencies."  *Id.*  Construing the facts in the light most favorable to Plaintiff, it is clear that Plaintiff possessed the basic skills necessary for performance of the job despite his performance issues, which the Court will address below.  The Court therefore finds that Plaintiff has met the minimal burden imposed by the second element.

The fourth element of a prima facie case "necessarily incorporates an inquiry as to whether the employer had notice of the plaintiff's disability."  *McCoy v. Morningside at Home*, No. 11-CV-2575, 2014 WL 737364, at *4 (S.D.N.Y. Feb. 25, 2014) (collecting cases).  Here, there is no dispute that NYPA was aware of Plaintiff's disability, nor does it dispute that Plaintiff suffered an adverse employment action when he was terminated. (Defs.' Mem. at 10.)  "The relevant question, therefore, is whether Plaintiff presented sufficient evidence that his termination was 'because of' his disability to satisfy his 'minimal burden' of establishing a prima facie case of discrimination under the *McDonnell Douglas* framework."  *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 251 (S.D.N.Y. 2015).

Although the Second Circuit "does not categorically define what circumstances permit an inference of discrimination," *Rosario v. Hilton Worldwide, Inc*., No. 09-CV-5336, 2011 WL 336394, at *3 (E.D.N.Y. Jan. 24, 2011), *aff'd sub nom. Rosario v. Hilton Hotels Corp*., 476 F. App'x 900 (2d Cir. 2012) (summary order), "a plaintiff must come forward with some evidence, beyond merely stating that he is a member of a protected class that suffered an adverse employment decision," *Williams v. Palladia, Inc.*, No. 07-CV-7720, 2009 WL 362100, at *7 (S.D.N.Y. Feb. 10, 2009).  "Such evidence may include [(1)] remarks or actions made by decisionmakers that could be viewed as reflecting a discriminatory animus[,] . . .  [(2)] preferential treatment given to employees outside the protected class[,] [or (3)] the timing or sequence of events leading to the plaintiff's termination."  *Rosario*, 2011 WL 336394, at *3 (internal quotation marks and citations omitted); *see also Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 91 (2d Cir. 1996) (same).

With respect to the first factor, in Plaintiff's EEOC Charge, Plaintiff alleges that Sliker, his supervisor, "made repeated adverse reference[s]" to his disability and "complained" to

Plaintiff "about the scheduling difficulties" caused by his frequent absences, which were due to his disability.  (Pl.'s Decl. Ex. T ("Pl.'s EEOC Charge") (Dkt. No. 113-2).)  However, in Plaintiff's deposition, when asked whether anybody ever made a comment to him about his disability, Plaintiff replied that he could not recall such a comment and that he would remember if somebody did make such a comment.  (Pl.'s Deposition Tr. 140:23–25, 141:1–6.)  As a general matter, plaintiffs cannot "create a genuine issue of material fact by . . . contradicting [their] own prior testimony in a deposition," *Clark*, 96 F. Supp. 3d at 251–52; *cf. In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213 (2d Cir. 2014) (explaining that "plaintiffs may not create material issues of fact by submitting affidavits that dispute their own prior testimony").  However, the EEOC Charge was submitted prior to Plaintiff's deposition, so it does not reflect an attempt by Plaintiff to create a genuine issue of material fact. But, due to the conflicting evidence from Plaintiff, the Court determines that this allegation neither supports nor cuts against a finding that the circumstances surrounding Plaintiff's termination give rise to an inference of discrimination.

With respect to the second factor, Plaintiff alleges that "around September 2014 . . . Plaintiff was passed over for an important project. . . . A coworker with no prior dealings with the project or the customer was assigned as lead project manager instead of [Plaintiff]."  (Pl.'s Opp'n at 11.)  In order to show that preferential treatment was given to members outside of the protected class, the plaintiff must show that the comparators in question were "similarly situated to the plaintiff in all material respects."  *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (internal quotation marks omitted); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (noting that the circumstances surrounding the "similarly situated" employees "need not be identical [to the plaintiff's], but there should be a reasonably close resemblance of facts

and circumstances").  Plaintiff does not provide any detail or further evidence with which the Court can analyze whether the employee who was given the role of lead project manager was similarly situated to Plaintiff.  Rather, Plaintiff's sole evidence to support this claim is his own "conclusory statements [and] mere allegations."  *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)).  Thus, the Court cannot find an inference of discrimination based on Plaintiff's allegation of preferential treatment given to employees outside the protected class.

Finally, in support of Plaintiff's argument that he has presented evidence of circumstances giving rise to an inference of disability discrimination, Plaintiff references that he took a "significant amount of time off work from [May to September] 2016, because of episodic Chron's attacks and a major life-saving surgery," and that Defendants "were clear that they based Mr. Davis's termination, in part, on communication issues relating to Mr. Davis's disability related absences between May and September [of 2016]."  (Pl.'s Opp'n at 19.)  On its own, this assertion does not support an inference of discrimination because the prolonged absences Plaintiff mentions occurred almost two years before he was ultimately terminated in April of 2018.  (*See* Pl.'s Termination Letter.)  However, in an April 11, 2018 memorandum from Sliker to Ranade entitled "Termination Justification: Edward Davis," Sliker mentioned a "lack of timely communication . . . surrounding time out of the office and the status of [Plaintiff's] medical leave" and cited to the Final Warning Plaintiff received in September 2016 as being one of the reasons for his termination.  (Termination Justification Letter 2; *see also* 2016 Final Warning Letter.)  Because Plaintiff was terminated only twelve days later, on April 23, 2018, this sequence of events suggests evidence of circumstances giving rise to an inference of disability discrimination.  Thus, Plaintiff has established causation—and consequently has met the minimal burden required to establish a prima facie case of disability discrimination.

23

b. Non-Discriminatory Reason

At the second step of the *McDonnell Douglas* analysis, "the defendant must produce evidence" which supports a "clear and specific" explanation for the termination, and which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (internal quotation marks and emphasis omitted); *see also Avella v. Valley Cent. Sch. Dist.*, No. 09-CV-923, 2011 WL 6338805, at *7 (S.D.N.Y. Dec. 19, 2011) (same). "If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (alterations and internal quotation marks omitted).

Defendants list several legitimate, non-discriminatory reasons for terminating Plaintiff's employment. First, "[a]fter an investigation, NYPA determined that Plaintiff had misused his corporate credit card, making numerous personal purchases . . . ." (Defs.' Mem. at 13; *see also* Pl.'s Termination Letter.) Defendants also produced evidence that at least three other NYPA employees were terminated for making unauthorized personal purchases on their corporate credit cards between 2015 and 2020. (*See* Defs.' Mem. at 13; *see generally* Comparator Termination Justification.) Defendants cite to *Ware v. L-3 Vertex Aerospace, LLC*, (Defs.' Mem. at 13), in which the court found that the plaintiff's misuse of his corporate credit card for personal purposes constituted a legitimate, non-discriminatory reason for terminating the plaintiff's employment. No. 16-CV-8067, 2020 WL 783764, at *6 (S.D.N.Y. Feb. 18, 2020), *aff'd*, 833 F. App'x 357 (2d Cir. 2020) (summary order).

Second, Defendants pointed to "Plaintiff's consistently poor performance and his failure to communicate with management regarding his absences until threatened with termination." (Defs.' Mem. at 13.)  Defendants submitted evidence in support of this assertion.  For example, Defendants shared multiple performance reviews reflecting negatively on Plaintiff's performance.  (*See* Pl.'s 2013 Performance Review at 12 ("Communications between [Plaintiff] and [his supervisor] have been challenging in 2013 . . . [due in part to] "a reluctance to share draft work" and difficulty with customer relations); Pl.'s 2015 Performance Review at 3 (Plaintiff's "communication on project assignments is still significantly [] poor. . . . In short, [Plaintiff] is not receptive to supervision."); Pl.'s 2016 Performance Review at 4 (Plaintiff "did not exhibit competency in 2016 in terms of [] communications, collaborations, and execution).)  Defendants also submitted multiple warning letters that Plaintiff received in the years leading up to his termination.  For example, "in 2012, Plaintiff was issued a warning letter for his inappropriate discussions with Metro-North, with a client of NYPA."  (Defs.' Mem. at 2; *see also* 2012 Warning Letter).  This situation was considered by NYPA to be "so severe as to warrant issuing Plaintiff an 'cycle' performance review[,] . . . [a loss of] five vacation days[,] and [Plaintiff's] remov[al] from the Metro-North account."  (Defs.' Mem. at 2; *see also* 2012 Warning Letter at 2.)  Plaintiff received another warning letter in 2014 for "fail[ing] to comply with NYPA's attendance policies . . . [by] fail[ing] to communicate his absences from work." (Defs.' Mem. at 4; 2014 Warning Letter).  Plaintiff received a Final Warning in 2016 "for ongoing issues regarding Plaintiff's absences without communication and performance issues." (Defs.' Mem. at 4; *see also* 2016 Final Warning).

The Second Circuit and lower courts within it have consistently found poor performance to be a legitimate, non-discriminatory reason supporting the employee's termination.  *See*

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (finding that the employer met its burden to show a legitimate, non-discriminatory reason for terminating the plaintiff's employment where the employer cited the plaintiff's poor performance); *Woolf v. Bloomberg L.P.*, No. 16-CV-6953, 2019 WL 1046656, at *16 (S.D.N.Y. Mar. 5, 2019) (same), *aff'd sub nom. Woolf v. Strada*, 949 F.3d 89 (2d Cir. 2020), *aff'd. Woolf v. Strada*, 792 F. App'x 143 (2d Cir. 2020) (summary order); *Watson v. Arts & Ent. Television Network*, No. 04-CV-1932, 2008 WL 793596, at *16 (S.D.N.Y. Mar. 26, 2008) (finding that plaintiff's "excessive absence, tardiness[,] and poor job performance" constituted a legitimate, non-discriminatory reason), *aff'd*, 352 F. App'x 475 (2d Cir. 2009) (summary order); *Kho v. New York & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 718 (S.D.N.Y. 2018) (same); *Jacobson v. Cap. One Fin. Corp.*, No. 16-CV-06169, 2018 WL 6817064, at *18 (S.D.N.Y. Dec. 12, 2018) (same).

Accordingly, the Court concludes that Defendant has proffered legitimate, non-discriminatory reasons for terminating Plaintiff's employment. Thus, the burden shifts back to Plaintiff to show that those reasons are pretextual.

### c. Pretext

At the third and final step of the *McDonnell Douglas* analysis, the plaintiff "must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [disability] was the real reason for the discharge." *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996); *see also Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (holding that a plaintiff "must show, using evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason, that the defendant's proffered reason was pretextual" (citation and internal quotation marks

omitted)).  "The plaintiff retains the ultimate burden of persuasion," but "[s]ummary judgment is appropriate only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact."  *Id.*  (alterations and internal quotation marks omitted); *see also Clark*, 96 F. Supp. 3d at 254–55.

Liberally construed, Plaintiff argues that Defendants' proffered non-discriminatory reasons for terminating Plaintiff—his poor performance and lack of communication surrounding his medical absences—were pretextual.  (Pl.'s Opp'n. at 21.)[10]  In support of this assertion, Plaintiff claims that he "has an outstanding work ethic and always educated himself professionally[;] he always helped others any way he could[,] he always shared his work with others[,] and [has] always looked out for the benefit of his team and his employer."  (Pl.'s 56.1 ¶ 13.)  Plaintiff also submitted a document—which he appears to have created—listing his various accomplishments in 2017, the year prior to his termination.  (*See* Davis Decl. Ex. H ("Pl.'s 2017 Accomplishments") (Dkt. Nos. 109-1, 109-2, 109-3, 109-4).)  "The mere fact that an employee disagrees with [his] employer's assessments of [his] work, however, cannot standing on its own show that [his] employer's asserted reason for termination was pretextual."  *Ricks v. Conde Nast Publications, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000), *aff'd*, 6 F. App'x 74 (2d Cir. 2001) (summary order); *see also Amley v. Sumitomo Mitsui Banking Corp.*, No. 19-CV-3777, 2021 WL 4429784, at *17 (S.D.N.Y. Sept. 27, 2021) (same); *Boatright*, 2020 WL 7388661, at *22; *Borzon v. Green*, No. 16-CV-7385, 2018 WL 3212419, at *12 (S.D.N.Y. June 29, 2018) (declining to

---

[10] Plaintiff fails to make a distinct argument regarding pretext for his discrimination claims in his Opposition.  (Pl.'s Opp'n at 21.)  He merely refers back to his arguments for his retaliation claims, which require a similar, but slightly different analysis.  *See* infra Part II(B)(2). However, given Plaintiff's pro se status, the Court will interpret Plaintiff's Opposition "to raise the strongest arguments that [the submitted evidence] suggest[s]."  *Triestman,* 470 F.3d at 474 (italics and citation omitted).

find pretext where, even though the plaintiff disagreed with his employer regarding his alleged performance deficiencies, "it is undisputed that [the plaintiff] received feedback both formally and informally on several occasions prior to his termination, and it is undisputed that the feedback reflected dissatisfaction with his work."), *aff'd*, 778 F. App'x 16 (2d Cir. 2019) (summary order); *accord Cao-Bossa v. New York State Dep't of Lab.*, No. 18-CV-0509, 2021 WL 3674745, at *17 (N.D.N.Y. Aug. 19, 2021) (declining to find genuine dispute of material fact where the plaintiff "offered no evidence that [her] performance evaluations were inaccurate other than her own general assertions at her deposition that she does not believe they accurately reflect her performance," because "her unsubstantiated assertions and beliefs cannot outweigh the other evidence").  The Court therefore declines to find that Plaintiff's negative performance evaluations were pretextual.

      Liberally construed, Plaintiff alternatively argues that "[w]here the employer was aware that an employee's absences were related to a disability, . . . the employee's attendance record may be an impermissible pretext for the employee's disability." *Morris v. City of New York*, 153 F. Supp. 2d 494, 502 (S.D.N.Y. 2001) (collecting cases).  It is undisputed that Defendants were aware that Plaintiff's absences were related to his disability.  (*See, e.g.*, Defs.' 56.1 ¶¶ 69, 70–72.)  However, Defendants have submitted evidence that Plaintiff was not fired because of his absences; rather, Defendants' evidence shows that Plaintiff was fired, in part, because of his lack of communication about those absences, which was in violation of various company policies.  For example, the December 16, 2014 Written Warning from Sliker and John Markowitz to Plaintiff states, "Despite the fact that [Plaintiff's supervisor] ha[s] spoken to [him] on several occasions about [his] obligations pursuant to the Authority's policy, [Plaintiff] continue[s] to fail to report when [he is] unable to come to work, and to date, have not provided a satisfactory

reason to explain this continued refusal." (2014 Warning Letter 1.) The memorandum further states that at a meeting on December 4, 2014, regarding his uncommunicated absences, "[Plaintiff] responded that [he was] 'not interested' in providing [his supervisors] notice when [he] would be out of the office." (*Id.* at 2.) Similarly, the September 29, 2016 Final Warning states, "[Plaintiff's] lack of communication and responsiveness surrounding absences is excessive and will not be tolerated." (2016 Final Warning at 2.) It further states:

> Although the Authority has provided [Plaintiff] with medical leave, it is expected that [he] will keep [his supervisor] apprised of [his] anticipated return to work and produce the necessary documentation to support [his] leave upon request by the Authority or communicate within a reasonable timeframe a compelling reason why [he is] unable to produce such documentation.

(*Id.* at 3.)

Courts have declined to find pretext where an employer terminates an employee due to a failure to communicate or provide documentation regarding medical leave, in violation of a company policy or employment agreement. *See, e.g., Dollar v. Brooklyn Hosp. Ctr.*, No. 10-CV-4807, 2011 WL 5117603, at *4 (E.D.N.Y. Oct. 24, 2011) (concluding that an employer's proffered reason for termination—that an employee "fail[ed] to follow reasonable rules requiring him to update [his employer] regarding his medical condition"—was not pretextual, in light of the company's policy, "which it communicated to [the plaintiff] through letters and in person, that employees on medical leave were required to regularly provide updated documentation of their ongoing need for the leave and expected date of return"); *Mayo v. Columbia Univ.*, No. 01-CV-2002, 2003 WL 1824628, at *7 (S.D.N.Y. Apr. 7, 2003) (rejecting plaintiff's claim of pretext where plaintiff "had a history of unplanned absences[, failed] to communicate with his supervisors[,]" and failed to submit progress reports on his condition and other documentation regarding his medical leave in violation of a "return to work agreement"); *cf. Clark*, 96 F. Supp.

3d at 260 (finding no discriminatory animus where "the delay in granting [the] [p]laintiff's medical leave was due to her failure to submit documentation of her disability despite [her employers'] requests").  Thus, the Court also declines to find that Defendants' assertion that Plaintiff was terminated in part due to lack of communication regarding absences was pretextual.

Finally, liberally construed, Plaintiff also argues that Defendants' last purported legitimate, non-discriminatory reasons for terminating his employment—that Plaintiff misused his corporate credit card—was pretextual because he was "found . . . innocent of any wrongdoing."  (Pl.'s 56.1 ¶ 61.)  The Court first notes that Plaintiff misconstrues the record on this point.  During a New York State DOL hearing, the Administrative Law Judge found that Plaintiff's misuse of NYPA's corporate credit card did not rise to the level of misconduct, overruling an initial determination disqualifying Plaintiff from receiving unemployment benefits. (*See* ALJ Findings and Opinion).  Specifically, Hon. Elizabeth Nicolato found:

> Therefore, under the particular facts and circumstances of the case; and, while not specifically finding either authorized or appropriate the claimant's at least arguably self-serving interpretation of the terms under which he could use the agency card to; for example and as argued; assist with his personal cash flow and/or track his expenses for his personal income taxes; I also do not find that he was a specifically forewarned employee concerning such matters who thus knew or reasonably should be held to have known that the manner in which he consistently had used the agency-credit card throughout the balance or his term of employment; including regularly to cover certain personal expenses which he then reimbursed; at any particular point imminently would have jeopardized his continued employment. I thus find it has not been substantiated that the claimant was discharged under conditions rising to the level of disqualifying misconduct within the meaning of the Law.

(*Id.* at 9.)  Plaintiff is thus incorrect in his assertion that he was "acquitted of [his] employer's claims of misuse."  (Pl.'s 56.1 ¶ 61.)

Second, the Court finds that Plaintiff cannot carry his burden to demonstrate pretext on this point.

> It is not the Court's role to second-guess an employer's non[-]discriminatory business decisions, question the manner in which it conducts its internal investigations, make an independent decision as to whether the plaintiff committed the subject misconduct, or determine whether the employer's actions were justified. Even if it were shown that [P]laintiff did not in fact commit the misconduct for which he was fired, that alone does not suggest that the reason for his discharge was pretextual.

*Maturine v. Am. Int'l Grp., Inc.*, No. 04-CV-9064, 2006 WL 3206098, at *6 (S.D.N.Y. Nov. 6, 2006) (citations omitted) (collecting cases); *see also Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019) ("[The plaintiff] cannot urge pretext simply by questioning whether her misconduct was sufficiently severe to warrant termination."); *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("The court's role is to prevent unlawful hiring practices, not to act as a super[-]personnel department that second guesses employers' business judgments.") (quotation marks omitted)).  Plaintiff has offered no evidence to demonstrate that "the manner in which the investigation was conducted and the resulting decision to terminate him was discriminatorily motivated."  *Maturine,* 2006 WL 3206098 at *7.  Thus, Plaintiff's claim of pretext fails for all three of Defendants' proffered non-discriminatory reasons for terminating Plaintiff's employment.  Defendants are therefore entitled to summary judgment on Plaintiff's ADA, Rehabilitation Act, and NYSHRL claims.

### 2.  Retaliation Claims

#### a.  ADA, Rehabilitation Act, and NYSHRL

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  "The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because []he 'has opposed any practices forbidden under this article or because . . . []he has filed a complaint,

31

testified or assisted in any proceeding under this article.'"  *Farmer*, 473 F. Supp. 3d at 330

(alteration in original) (quoting N.Y. Exec. Law § 296(7)).  "[T]he Rehabilitation Act also

prohibits retaliation against a person for opposing any practice made unlawful by the Act."

*Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 245 (S.D.N.Y. 2020) (citing 29 U.S.C. §

794(d)).

The Second Circuit has identified four elements for a prima facie case of retaliation under

the ADA: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that

[the] plaintiff was involved in protected activity; (iii) an adverse decision or course of action was

taken against [the] plaintiff; and (iv) a causal connection exists between the protected activity

and the adverse action."  *Weixel v. Bd. of Educ. of City of N.Y.,* 287 F.3d 138, 148 (2d Cir. 2002)

(internal quotation marks omitted).  The Second Circuit has applied the same elements to claims

of retaliation under the NYSHRL and Rehabilitation Act.  *See id.* at 148–49 (elements of a

retaliation claim under Rehabilitation Act are same as the ADA); *Weissman v. Dawn Joy*

*Fashions, Inc*., 214 F.3d 224, 234 (2d Cir. 2000) (applying the same four factors to plaintiff's

retaliation claim under both ADA and NYHRL).

"Claims for retaliation [under the ADA, Rehabilitation Act, and NYSHRL] are analyzed

under the same burden-shifting framework established [in *McDonnell Douglas*]."  *Treglia v.*

*Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002); *see also Ben-Levy*, 518 F. App'x at 18.  At

the prima facie stage, a plaintiff's burden is "de minimis."  *Treglia,* 313 F.3d at 719 (citations

and italics omitted).   Once a plaintiff establishes the prima facie case, the burden shifts to

defendant "to articulate a legitimate, non-retaliatory reason for the challenged employment

decision."  *Treglia*, 313 F.3d at 721; *see also Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d

Cir. 2013) (describing the burden shifting framework for a summary judgment claim in a Title

VII action).  "If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Treglia,* 313 F.3d at 721 (internal quotation marks omitted).

The Court finds that Plaintiff has met the first three elements of a prima facie case of retaliation under the ADA, Rehabilitation Act, and the NYSHRL.  First, Plaintiff claims—and Defendants do not dispute—that he was engaged in protected activity when he filed complaints with the NYPA's AAO in 2014 and 2016, in which he claimed that Sliker was discriminating against him based on his disability.  (*See* Pl.'s 2014 AAO Complaint; Pl.'s 2016 AAO Complaint; *see also* Defs.' Mem. at 17.)  Second, although Plaintiff did not produce direct evidence showing that Sliker knew about his AAO complaints, in light of Plaintiff's pro se status, and given that Defendants concede that Plaintiff "may" have satisfied this element, (*see* Defs.' Mem. at 18), the Court finds that Plaintiff has met the second element.[11]

Third, there is no dispute that Plaintiff suffered an adverse employment action when NYPA terminated Plaintiff's employment.  (*See* Defs.' Mem. at 10.).  In the context of his retaliation claim, Plaintiff also argues that he suffered additional adverse employment actions in the form of negative performance reviews.  (Pl.'s Opp'n at 10–13.)  "To qualify as an adverse employment action, a negative performance evaluation must trigger negative consequences to the conditions of employment."  *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 469 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Ochoa v. New York*

---

[11] The Court also notes that Plaintiff alleges that in September 2014, Sliker "explicitly told [Plaintiff] that he was removed from [an important] project because of his discrimination complaint."  (Pl.'s Opp'n at 11.)  This provides at least circumstantial evidence that Sliker was aware of Plaintiff's 2014 AAO complaint.

*City Dep't of Educ.*, No. 20-CV-9014, 2021 WL 5450343, at *4 (S.D.N.Y. Nov. 22, 2021) ("The conduct in question—[a] negative job reference—undoubtedly qualifies as [an] adverse action[] taken against Plaintiff.").

"However, where negative performance reviews *do* trigger some adverse consequences to plaintiff's employment, courts in this district have left it to the trier of fact to determine whether those consequences rise to the level of adverse employment action. *Trachtenberg*, 937 F. Supp. at  469; *see also Dressler v. N.Y.C. Dep't of Educ.*, No. 10-CV-3769, 2012 WL 1038600, at *6–7 (S.D.N.Y. Mar. 29, 2012) (noting that evidence that teacher's unsatisfactory end-of-year rating "precluded him from the opportunity of participating in [a home instruction program] is sufficient to establish a basis on which a reasonable trier of fact could find a material adverse change"); *Shapiro v. N.Y.C. Dep't of Educ.*, 561 F. Supp. 2d 413, 423 (S.D.N.Y. 2008) (summary judgment denied where teachers who received unsatisfactory end-of-year ratings produced evidence that consequences of such ratings included removal from per session paid position, inability to transfer within the school district, inability to work in summer school, and damaged professional reputation).

Here, Plaintiff cites various consequences of his negative performance reviews, including that he was passed over for an important project in 2014, that he was denied his annual stipend in 2016 and 2017, and that Plaintiff received warning letters in 2014 and 2016.  (Pl.'s Opp'n at 11–12.)  Additionally, Plaintiff's performance issues were cited in his Termination Justification letter.  (Termination Justification Letter at 1–2.)  Thus, Plaintiff has met the second element of his retaliation claim; that is, both his termination and negative performance reviews constitute adverse employment actions.

However, Defendants argue—and the Court agrees—that Plaintiff cannot meet the fourth element, which requires Plaintiff to show a causal connection between the protected activity and the adverse employment action.  (*See* Defs.' Mem. at 18.).  Plaintiff argues that the "temporal proximity" between the "protected activity" supports a causal connection between the two events.  (Pl.'s Opp'n at 13.)  "[T]he causal connection needed for proof of a retaliation claim can be established by indirectly showing that the protected activity was closely followed in time by the adverse action."  *Clark*, 96 F. Supp. 3d at 262 (alteration in original) (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted)); *accord Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that temporal proximity alone may suffice to establish causation where proximity is very close); *see also Hopkins v. New England Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 254 (D. Conn. 2013) (same).  In *Clark*, the court held that "several days" was close enough to satisfy the causal element of a prima facie case of retaliation.  96 F. Supp. 3d at 262; *see also Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 351 (W.D.N.Y. 2012) (holding that a warning "coming approximately one month after plaintiff's final complaint . . . [was] sufficiently proximate to satisfy the inference of causation and the prima facie case of retaliation" (italics omitted)).

Here, Plaintiff made his last AAO complaint in March of 2016, (*see* Pl.'s 2016 AAO Complaint), and he was terminated over two years later in April of 2018, (*see* Pl.'s Termination Letter).  Although the Second Circuit "ha[s] not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between [a protected activity] and an allegedly retaliatory activity," *Summa*, 708 F.3d at 128 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)), the temporal proximity must be "very close," *Tenemille v. Town of Ramapo*, No. 18-CV-

724, 2020 WL 5731964, at \*12 (S.D.N.Y. Sept. 24, 2020) (internal quotation marks omitted) (quoting *Clark Cty. Sch. Dist.*, 532 U.S. at 273–74).

      With respect to the temporal proximity between Plaintiff's AAO complaint in 2016 and his termination in 2018, a lapse of as much as two years "suggests, by itself, no causality at all." *Id.* at \*12 (internal quotation marks omitted) (quoting *Clark Cty. Sch. Dist.*, 532 U.S. at 273–74); *see also Harper v. Brooklyn Children's Ctr.*, No. 12-CV-4545, 2014 WL 1154056, at \*5 (E.D.N.Y. Mar. 20, 2014) ("[T]he approximately two years between [the] plaintiff's 2007 federal action and [the] defendant's alleged retaliation in 2009 do not support an inference of retaliation because they lack temporal proximity." (internal quotation marks omitted)).  As such, when considering temporal proximity alone, Plaintiff's 2018 termination, is beyond the "outer limit of the amount of time that is considered sufficient to establish causation."  *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at \*5 (S.D.N.Y. Aug. 5, 2009) (finding that the passage of eleven months was at the "outer limit" of temporal proximity "sufficient to establish causation") (citations omitted); s*ee also Bucalo v. Shelter Island Union Free Sch. Dist*., 691 F.3d 119, 131 (2d Cir. 2012) (noting that courts "typically measure[ ] th[e] gap [between a protected activity and alleged retaliation] as a matter of months, not years" (citation omitted)); *Saenger v. Monte*, 706 F. Supp. 2d 494, 520 (S.D.N.Y. 2010) (finding that the passage of over a year between the plaintiff's age discrimination complaint and his termination was "outside the normal zone of tolerable temporal proximity" (collecting cases)); *Tori v. Marist Coll.*, No. 06-CV-419, 2008 WL 11451434, at \*13 (S.D.N.Y. Sept. 11, 2008) (granting a summary judgment motion when the gap between the protected activity and denial of tenure was more than five years); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Surely, two-and-one half years is far too long to warrant an inference of discriminatory retaliation." (citations omitted)).  The lapse of two

years between Plaintiff's last AAO complaint and the date of his termination is therefore too long to support a causal connection.

With respect to Plaintiff's negative reviews, the temporal proximity is closer. Plaintiff submitted his first AAO complaint on February 14, 2014, (Pl.'s 2014 AAO Complaint), and his year-end overall performance review of "Partially Achieved Expectations is dated December 30, 2014, (Pl.'s 2014 Performance Review). Plaintiff submitted his final AAO complaint on March 27, 2016, (Pl.'s 2016 AAO Complaint), his overall performance review of "Below Expectations" is dated January 31, 2017, (Pl.'s 2016 Performance Review). Though the temporal proximities between the AAO complaints and the negative reviews are shorter than the two years between his final AAO Complaint and his termination, ten months is still too long of a time period from which to infer causation. *See Douglas v. Eastman Kodak*, 373 F. Supp. 2d 218, 226 (W.D.N.Y. 2005) (finding ten-month period too long to support inference of causation); *Duviella v. Counseling Serv. of Eastern Dist. of New York*, 2001 WL 1776158, *19 (E.D.N.Y. Nov. 20, 2001), *aff'd*, 52 Fed. App'x. 152 (2d Cir. 2002) (summary order) (finding eight months insufficient to establish temporal proximity); *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 88 F. Supp. 2d 4, 8 (N.D.N.Y. 2000) (finding that nine months "does not create or permit an inference of discriminatory animus").

Because Plaintiff cannot make out a prima facie case of retaliation, the Court need not address whether Defendants had a legitimate, non-discriminatory reason for firing Plaintiff, nor whether that reason was pretextual. However, even if Plaintiff could make out a prima facie case of retaliation, as discussed above, Defendants have established legitimate, non-discriminatory reasons for Plaintiff's termination—that is, Plaintiff's misuse of the company credit card and poor performance. And, for the same reasons the Court found that Plaintiff failed to meet his

burden to show pretext in connection with his discrimination claims, the Court similarly finds here that Plaintiff has not shown that Defendants' non-discriminatory reasons for terminating his employment were pretextual. As explained above, Defendants have submitted evidence that Plaintiff received negative performance reviews and was ultimately terminated not because of his absences, but rather because Plaintiff failed to communicate as to when and how much work he would miss. And, as previously discussed, courts have declined to find pretext where the adverse employment action was taken due to the employee's failure to communicate or provide documentation regarding medical leave, in violation of a company policy or employment agreement—not because of the absences themselves. Thus, Plaintiff's retaliation claims under the ADA, Rehabilitation Act, and the NYSHR therefore cannot survive summary judgment.

b. FMLA Retaliation Claim

"The FMLA gives eligible employees an 'entitlement' to twelve work weeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)). "An employer violates the FMLA when it considers an employee's use of FMLA leave as a negative factor in its decision to terminate him." *Patel v. NYU Langone Hosps.*, No. 20-112, 2021 WL 4852426, at *3 (2d Cir. Oct. 19, 2021) (quotation marks omitted). "[F]or [Plaintiff's] complaint to give rise to an inference of retaliation for using FMLA leave, [Plaintiff] need[s] to plausibly allege that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* (quotation marks omitted) (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

"While there are slight differences in the showing needed to make out a prima facie case for retaliation from that for discrimination, claims of retaliation under the ADA, [Rehabilitation Act,] NYSHRL, and FMLA remain subject to the *McDonnell Douglas* burden-shifting analysis." *Ben-Levy*, 518 F. App'x at 19 (collecting cases); *see also Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziadio,* 817 F.3d at 429 (analyzing FMLA retaliation claim under the *McDonnell Douglas* framework); *Feggins v. Cty. of Niagara*, No. 18-CV-1217, 2021 WL 5416236, at *6 (W.D.N.Y. Nov. 19, 2021) (same).

Regarding the first element of a prima facie case of FMLA retaliation, there is no dispute that Plaintiff exercised rights protected under the FMLA. "Over the course of Plaintiff's employment with the NYPA, Plaintiff took FMLA leave on a number of different occasions, beginning in 2011 and the latest in 2017." (Defs.' 56.1 ¶ 68; *see also* Pl.'s 2011 FMLA Paperwork; Pl.'s 2012 FMLA Paperwork; Pl.'s 2013 FMLA Paperwork; Pl.'s 2014 FMLA Paperwork; Pl.'s 2015 FMLA Paperwork; Pl.'s 2016 FMLA Paperwork; Pl.'s 2017 FMLA Paperwork.)

The Court has already found that Plaintiff met the minimal burden required to show that he was qualified for his position. Plaintiff thus meets second element of a prima facie case of FMLA retaliation. As mentioned above, in the context of his retaliation claims, Plaintiff suffered an adverse employment action when NYPA gave him negative performance reviews and terminated his employment. (*See* Defs.' Mem. at 10.)

With respect to the fourth element, liberally construed, Plaintiff argues that, retaliatory intent can be inferred from the fact that "Plaintiff did not have performance issues until he began taking FMLA leave for Crohn's." (Pl.'s Opp'n at 12.) Defendants argue, however, that Plaintiff cannot meet the causation element, arguing that Plaintiff has "failed to show any evidence to connect the mere fact that he took FMLA leave and suffered an adverse employment action." (Defs.' Mem. at 18.) The Court agrees with Defendants. Defendants cite *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193 (S.D.N.Y. 2009), in support of their position. (*See* Defs.' Mem. at __.). In *Di Giovanna*, the court rejected the plaintiff's claim that he was terminated in retaliation for taking FMLA leave. *See* 651 F. Supp. 2d at 209. The court explained,

> To accept [the plaintiff's] claim . . ., one would have to believe that, after having no problem "at all" with his taking off roughly twenty-seven days [of FMLA leave], [the defendants] decided to punish [the plaintiff] for taking one day of FMLA leave by setting up an elaborate, months-long scheme to gin up evidence of poor performance in order to terminate him. This theory defies credulity and finds no support in the record.

*Id.* Plaintiff similarly appears to argue that Defendants suddenly developed a retaliatory intent toward Plaintiff after granting him FMLA leave without issue for seven years. (*See* Defs.' Mem at 16–17; Defs.' 56.1 ¶ 72; Pl.'s Deposition Tr. 142:13–25, 143:1–8.) As the court found in *Di Giovanna*, Plaintiff's argument defies logic and is unsupported by the record.

Liberally construed, Plaintiff next argues that retaliatory intent can be inferred from Sliker's comments that Plaintiff's FMLA leave "interfered with his management of his department and his projects." (Pl.'s Deposition Tr. 143:9–18.)[12] In *Di Giovanna*, the court

---

[12] Plaintiff could not recall when Sliker allegedly said these words. (*Id.* at 143:19–25.) Specifically, Plaintiff stated in his deposition:

Q: When did he say that?

A: I don't remember.

found no evidence of causation even where the plaintiff argued that the defendants "were annoyed because they perceived that [his] FMLA leave inconvenienced them."  651 F. Supp. 2d at 208 (quotation marks omitted).  Moreover, "isolated and stray remarks, without more, are insufficient to raise an inference of retaliation." *Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 690 (S.D.N.Y. 2020) (quoting *Alexander v. Bd. of Educ. of City Sch. Dist. of City of New York*, 107 F. Supp. 3d 323, 330 (S.D.N.Y. 2015), *aff'd*, 648 F. App'x 118 (2d Cir. 2016)), *aff'd*, 845 F. App'x 11 (2d Cir. 2021) (summary order); *see also Muhleisen v. Wear Me Apparel LLC*, 644 F. Supp. 2d 375, 377, 388 (S.D.N.Y. 2009).

Finally, the Court interprets Plaintiff's Opposition to argue that "the temporal proximity between the FMLA leave" and adverse employment actions support an inference of retaliation. (Pl.'s Opp'n at 13.)  The Court addressed this point above, finding that the length of time between Plaintiff filing his AAO complaints and his negative reviews and termination was too long to suggest a causal connection between the events.  However, in 2016, the temporal proximity between Plaintiff requesting FMLA leave and receiving a negative performance review was four months.  (Pl.'s Opp'n at 12.)  That is, Plaintiff requested FMLA leave on September 16, 2016, (Pl.'s 2016 FMLA Paperwork), and he received an overall performance review of "Below Expectations" on January 31, 2017, (Pl.'s 2016 Performance Review).  As

---

Q: Did he ever put that into an email to you?

A: No.

Q: How many times did he say that?

A: I don't remember. Multiple times.

(*Id.*)  In his Opposition, Plaintiff stated that these comments occurred "between 2015 and 2017." (Pl.'s Opp'n at 12.)

discussed above, courts in the Second Circuit and in this district have found four months to be too remote to support an inference of causation.  *See Hollander v. American Cyanamid Co*., 895 F.2d 80, 84–85 (2d Cir. 1990) (finding no causation was established where three and a half months passed between the protected activity and the adverse action); *Yarde v. Good Samaritan Hosp*., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation. . . . Six months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation." (citation omitted)); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected . . . activity and the alleged act of retaliation." (citations omitted)); *James v. Newsweek*, No. 96-CV- 0393, 1999 WL 796173, at *15 (S.D.N.Y. Sept. 30, 1999) (holding that four months is too long to suggest causal relationship between protected activity and adverse employment action); *accord Filipovic v. K&R Express Sys., Inc*., 176 F.3d 390, 398–99 (7th Cir. 1999) (concluding that four months was too long to suggest a causal relationship between filing charges and termination); *Conner v. Schnuck Mkts., Inc*., 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that "the four month time lag between [the plaintiff's] participation in protected activity and [the adverse employment action: would not be sufficient to justify an inference of causation") (*cited in Morris v. Lindau*, 196 F.3d 102, 113 (2d Cir. 1999)). Thus, Plaintiff cannot meet his burden to show causation.

Even if Plaintiff could make out a prima facie case of FMLA retaliation, as the Court has already found, Defendants have established legitimate, non-discriminatory reasons for Plaintiff's termination and negative performance reviews.  And, for the same reasons the Court found that Plaintiff failed to meet his burden to show pretext in connection with his discrimination and

retaliation claims under the ADA Rehabilitation Act, and NYSHRL, the Court similarly finds

here that Plaintiff has not shown that Defendants' non-discriminatory reasons for terminating his

employment were pretextual.  Thus, Plaintiff's FMLA retaliation claim cannot survive summary

judgment.

      3.  Defamation Claim

      "Defamation is the injury to one's reputation either by written expression, which is libel,

or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456

(S.D.N.Y. 2012) (quotation marks omitted) (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 365

(S.D.N.Y. 2000)).  "To successfully allege defamation under New York law, the following

elements must be met: '(1) a written defamatory statement of and concerning the plaintiff, (2)

publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special

damages or per se actionability.'" *Ganske v. Mensch*, No. 19-CV-6943, 2020 WL 4890423

(S.D.N.Y. Aug. 20, 2020) (quoting *Palin v. New York Times Co*., 940 F.3d 804, 809 (2d Cir.

2019)).

      Plaintiff alleges a defamation claim based on "[d]erogatory material and testimonial

evidence of false claims made by [D]efendants during Administrative Law hearing."  (SAC ¶

25.)  Defendants argue that Plaintiff's defamation claim cannot survive a motion for summary

judgment because "testimony and documentary evidence submitted in a Department of Labor

Unemployment Insurance Hearing are subject to New York's litigation privilege, which is an

absolute privilege . . . ."  (Defs.' Mem. at 19.)  The Court agrees with Defendants.

      "It is well settled in New York . . . that statements made in quasi-judicial proceedings,

including proceedings by agencies . . . are protected by an absolute privilege." *Hinds v. Magna

Fabrics, Inc*., No. 96-CV-1383, 1997 WL 309378 at *5 (S.D.N.Y. June 9, 1997)); *see also Paul*

*v. Lenox Hill Hosp.*, No. 13-CV-01566, 2016 WL 4775532, at *23 (E.D.N.Y. Jan. 15, 2016)

(finding that in defamation cases, "the [New York] state courts have extended [an] absolute

privilege to quasi-judicial or administrative hearings . . . and to statements made by judges,

jurors, witnesses, parties, and counsel alike."); *Pappas v. Air France*, 652 F. Supp. 198, 202

(E.D.N.Y. 1986) ("New York law . . . holds privileged statements made in the course of a quasi-

judicial proceeding.").  Indeed, under New York Law, "communications with the DOL are

subject to absolute privilege."  *Blige v. City Univ. of New York*, No. 15-CV-08873, 2017 WL

498580, at *11 (S.D.N.Y. Jan. 19, 2017), *report and recommendation adopted*, 2017 WL

1064716 (S.D.N.Y. Mar. 21, 2017); *Allen v. St. Cabrini Nursing Home*, No. 00-CV-8558, 2001

WL 286788, at *6 (S.D.N.Y. Mar. 9, 2001) (dismissing defamation claims where defendants

communicated with the New York DOL regarding the plaintiff's right unemployment benefits),

*aff'd sub nom.*, *Allen v. St. Cabrini Nursing Home Inc.*, 64 F. App'x 836 (2d Cir. 2003)

(summary order).

Because the communications in question were made during a New York DOL hearing,

they are subject to an absolute privilege.  Thus, Plaintiff's defamation claim cannot survive

Defendants' Motion.  *See Viruet v. Citizen Advice Bureau*, No. 01-CV-4594, 2002 WL 1880731,

at *23 (S.D.N.Y. Aug. 15, 2002) ("[A]ny information that [the defendant] communicated to the

Department of Labor regarding [plaintiff's] eligibility for unemployment benefits was privileged

under New York law and cannot provide the basis for a defamation claim.").

4. Claims Against Individual Defendants

Plaintiff makes claims against Defendants Sliker, Ranade, Pollack, Pizzo, Belnick,

Driscoll, Harvey, and Quiniones.  (*See generally* SAC.)  Defendants argue that the Individual

Defendants are entitled to summary judgment on the claims against them.  (Defs.' Mem. at 20–23.)  The Court agrees.

First, "as a matter of law, individuals may not be held liable under the ADA, and Plaintiff does not appear to offer an argument to the contrary."  *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 185 (S.D.N.Y. 2020); *see also Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) ("[I]n the context of employment discrimination, the retaliation provision of the ADA[ ] . . . cannot provide for individual liability."); *Cerrato v. Durham*, 941 F. Supp. 388, 395 (S.D.N.Y. 1996) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995)).  The same applies to the Rehabilitation Act.  *See, e.g.*, *J.L. on behalf of J.P. v. New York City Dep't of Educ.*, 324 F. Supp. 3d 455, 467 (S.D.N.Y. 2018) ("There is no individual liability under the ADA or § 504 of the Rehabilitation Act.").  Thus, any claims under the ADA or Rehabilitation Act that Plaintiff attempts to make against any of the Individual Defendants cannot survive summary judgment.

Plaintiffs "may be able to assert claims under the NYSHRL against [] individual defendants."  *Cornetta*, 434 F. Supp. 3d at 185; *Rodriguez v. Morales*, No. 19-CV-4409, 2019 WL 2410046, at *3 (S.D.N.Y. June 6, 2019) (same); *see also Tolbert v. Smith*, 790 F.3d 427, 434 n.3 (2d Cir. 2015) (noting that the NYSHRL provides for individual liability under an aiding-and-abetting theory).  However, "[u]nder the NYSHRL standard for aiding and abetting liability, '[t]here is . . . a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.'"  *Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 536 (E.D.N.Y. 2005) (second and third alterations in original) (quoting *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999)); *see also Sowemimo v. D.A.O.R Sec., Inc.*, 43 F. Supp. 2d 477, 490–91 (S.D.N.Y. 1999) (concluding that the plaintiff failed to establish liability against an individual defendant's employer thereby eliminating her

claims against the individual defendant as an aider and abettor under the NYSHRL).  Because Plaintiff has failed to establish NYPA's liability, Plaintiff's NYHRSL claims against the Individual Defendants likewise cannot survive summary judgment.

Finally, "[i]n assessing individual liability under the FMLA, district courts within the Second Circuit have applied the FLSA [Fair Labor Standards Act] test of 'whether, as a matter of economic reality, an entity is an employer for purposes of the FLSA' to the FMLA because the FMLA definition of employer 'tracks that of the FLSA.'"  *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 475–76 (S.D.N.Y. 2011) (quoting *Augustine v. AXA Fin.*, Inc., No. 07-CV-8362, 2008 WL 5025017, at *3 (S.D.N.Y. Nov. 24, 2008)); *see also Johnson v. A.P. Prods., Ltd.,* 934 F. Supp. 625, 628–29 (S.D.N.Y.1996) (finding that the FMLA "extends to all those who controlled in whole or in part [Plaintiff's] ability to take a leave of absence and return to [his] position." (internal quotation marks omitted)).  Thus, the Court must determine "whether each named individual defendant controlled in whole or in part [] [P]laintiff['s] rights under the FMLA."  *Holt v. Welch Allyn, Inc.,* No. 95-CV-1135, 1997 WL 210420, at *2 (N.D.N.Y. Apr. 15, 1997) (internal quotation marks omitted).  However, because the Court has already determined that Plaintiff failed to make out a prima facie case of FMLA retaliation, the Court need not reach the issue of whether any of the Individual Defendants are liable on that claim.

Thus, all Individual Defendants are entitled to summary judgment on all of Plaintiff's claims.

### III. Conclusion

For the reasons stated above, the Defendants' Motion for Summary Judgment is granted.

The Clerk of Court is respectfully directed to terminate the instant Motion, (Dkt. No. 88), enter

judgment for Defendants, close this case, and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

DATED:         February 2, 2022
              White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE